Good afternoon, Your Honors. Juan Rocha on behalf of Appellant. I reserve three minutes for rebuttal. Your Honors, this case is about the agents violating Mr. Poom-Medina's Fourth Amendment rights when they engaged in an impermissible knock and talk by going to the back of his house, deceiving Mr. Medina, Mr. Poom-Medina into believing it was someone that they knew. And the Court has said that that knock and talk is something that could breach the curtilage. It gives police officers the ability to breach the curtilage to go at high noon. It's been stated in Davis in 1964, and the Court has reiterated that there's nothing wrong with police officers going at high noon with the honest intent of asking questions of the occupant of the house. Counsel, was this argument preserved in the district court, and was it raised in your opening brief? Yes, Your Honor. This issue, when we argued the case at the suppression hearing, the issue that was raised at the argument was the knock and talk. In fact … I thought it was a straight-up consent question. Your Honor, the consent knock and talk, they're aligned issues. They're so intertwined. And that issue, however, the knock and talk itself had been raised. In fact, at argument, I argued that, you know, that it was an impermissible knock and talk. So I asked … I told the magistrate court, here you are at midnight Saturday, there's a knock and talk. Now, it's important, a knock and talk, there's nothing wrong with that, but going to the front door to ask, to solicit something, we're talking here about the middle of the night, we're not talking the front door, we're talking the back door, so this is simply not a knock and talk, and I can sell you Girl Scout cookies. That's what … Right. Let me … So, Your Honor, we have preserved the argument. Let me just insert a … I just want to make sure you've answered Judge Graber's question. Yes. Sorry, and then I'll insert mine. Sorry. Go ahead. Were you finishing? Yes, I believe. So we have, I believe, preserved the issue. And in the magistrate court, when they actually issued its report and recommendation, the magistrate court actually had a section, section A, in which it discussed the knock and talk, Your Honor. So I … the judge knew, the magistrate court knew that that's what the parties were actually arguing throughout. The court judge … the magistrate court talked about Pereira Rea, the Cormier case, that it was permissible, and it actually found that the officers conducted a permissible knock and talk because it was short and there was no law enforcement coercion involved, is what the magistrate judge found. All right. Sorry. You're hanging a lot on the fact that this was the middle of the night and this was the back door. The problem I have with that, which I'd love to hear you help me on, is that this is a clear error situation, as I understand it, and it's a terribly undeveloped record. The defendant didn't testify. There were no other occupants of the house. Speaking to myself personally, everybody comes through the back door. Ninety-nine percent of the people who come to my house come through the back door, not the front door. It doesn't mean anything. Middle of the night depends on what your hours are. Nobody testified that this was a – we have conflicting testimony about whether it was light or dark. We have conflicting testimony about whether the back door was typically used. Is this the right case for us to make a hard and fast rule that you can only knock and talk between the hours of 9 a.m. and 5 p.m., but after 5 p.m. you can't do a knock and talk, particularly in a clear error context? Your Honor, we're not asking the court to develop a bright-line rule that police can never go to the back door. I believe the Pereira case talks about that it's not required for officers to go to the front door and make that metaphysical inquiry. It's what they believe is accessible. Here, as you can see from the pictures that's submitted in Supplemental, there was a clear path to the front door, so there was no need for metaphysical inquiry. It's clear from the pictures, Exhibit 23, that there was a wall that was covering the back door. In other words, it's hidden from the public. So the facts of this case clearly show that the front door was the way to have gone there to knock on the door. You've lost me even further back. Front door, back door, I don't get it. What difference does it make? Because, Your Honor, the idea here of a knock and talk is where uninvited visitors would be expected to go. And given the pictures and what the officers did, going to Mr. Puma's back door is not something uninvited visitors would be going. You wouldn't have mailmen, you wouldn't have — So what? For constitutional purposes, what does that matter, whether you expect — I mean, you've got a door there. They didn't break down the door. They knocked. What difference does it make whether you expect visitors there or not? What's the doctrine here? Well, Your Honor, first, I think we could agree that the back door in this case was part of the curtilage. So he has an expectation there to have some sort of privacy. That's — Okay. So it is part of the curtilage. But they didn't get anything. It's not like they go into the curtilage and they find contraband sitting on the porch. They just — they go to the — through the curtilage and they knock. And it's not until he says, come in, that they find anything. They don't find the gun until after he says, come in. So what difference does it make whether they knock on the front door or the back door? It's not like a dog. It's not like you had the dog there. You said, oh, the dog's on the porch. He's now sniffing something. A door is a door. Well, Your Honor, here the officers had an informant, a snitch. And, you know, a snitch could be like a dog, where it says — they told him — I'm sorry. A snitch is supposed to sniff? You know, I don't buy it. I'm sorry. What I meant to say is that the snitch here gave him information that says, if you want access to the back door, here's how you do it. There's a pass — there's a password, right? I understand. I'm sorry? So there's a password. But they didn't get anything from the back door. The only thing they got is ones that were inside the house. If they go to the back door and sitting there in the backyard is a large bale of marijuana, I would say, yes, well, you've got an issue because how do they get to the back door and why do they get to the back door? But they don't. They get to the door. They've got nothing, right? It's just like being at the front door. They don't sniff anything. They don't see anything. They don't find anything. They knock on the door. They open the door. There's still nothing. At that point, they ask your client, can we come in? He says, yes, come in. It's only after they're through the door that they find the contraband. And it doesn't matter whether they walked in the front door or the back door. I just don't see where the issue is here. The front door or back door just seems like a red herring. Your Honor, again, we believe there was an impermissible knock and talk. I've never heard of a knock and talk. What's impermissible about a knock and talk? Because had they not deceived Mr. Poom, it's unlikely he would have opened the door. In the Johnson case, he would have opened the door. Had they not what? Meaning they were someone that he knew. So in other words, the fact that they deceived him was a way for them to get to see what was actually inside the house. And you have evidence? But there are plenty of cases that say that the police can use or don't have to tell the truth about why they're there, right? There are a number of cases that, I mean, that's what, you know, undercover agents do that all the time. But we're not talking about undercover agents. No, but there's no freestanding rule that if the police lie to you to get you to say or say something, there's no freestanding rule that says that deception by itself is unconstitutional. That's correct. Within the context of the knock and talk, however, I was not able to find a case in which a court held that the officers using deception was a permissible knock and talk. And where's the evidence in the record that if he had known, if they had knocked on the front door, he wouldn't have opened? Your Honor, government counsel at a closing argument discusses... I'm sorry. Government counsel argument is not an answer to where in the record. And where in the record is something that says testimony or affidavit or something like that? So saying government counsel argued doesn't answer my question. You can tell me what government counsel argued after you answer my question. Where in the record is our evidence that had he, had the knock come on the front door, he wouldn't have opened it? Which is the argument you made. Yeah, that's correct. Where in the record is evidence to that effect? Our position is that when the officer was asked... You're not going to answer my question? The answer is, here it is in the record, it isn't in the record, or I don't know. It's got to be one of those three things. Your Honor, it's in our opening brief where we discuss the officers said... Your opening brief is not evidence in the record. Is there evidence in the record? I mean, you made an assertion. You said, look, if they come through the front door, he probably wouldn't have opened the door. You stood there... Right. ...two minutes ago and said that. I'm asking you to support that with evidence in the record. If you go to Judge Ponce's back door and you knocked on the door, he would open it. So how do we know that your clients would not have opened the door if they had known it was that the person at the back door was the police? Your Honor, again, it goes back to the password, the code the officers used. They knocked on the door. There was a certain syntax. They said, knock on the door three times and say, open the door, hey, open the door. Say, it's me, and then knock three more times to get him to open the door. Let me interrupt on that because, okay, you're right, they got him to open the door. But there was not a shred of deception from that point. They're there in uniform. They've got their badges on. They say, we are here to investigate. And he says, thank you very much, good night. No. Boom. He closes the door. They didn't say, I'm Charlie the Fink and I'm coming here with drugs or something. They were law enforcement agents. They didn't deceive him at all after he opened the door. And it was after he opened the door that he made the decision to let them come in. That's what the judge found. Ontario did. Your Honor, this Court's case in Johnson where you had a similar circumstance. Now, that wasn't a knock. Those were guns pointed right at the guy's head when they – in Johnson. When they were standing out, you had several people with guns drawn pointing at the guy's head and they said, will you let us come in? Okay. Different facts. There were no guns drawn here. Is that correct? Your Honor, the difference is that this Court first found that the defendant opening the door based on the agent's misrepresentation made the defendant's initial exposure and physical control of the agents was not consensual. So even before you get to the guns, the fact that they misrepresented, this Court found that that was not consensual on the person's part. The troop case, which is the Fifth Circuit case we cited, and that's what happened in this case. The deception, and again, as Judge Graber pointed out, they don't have to tell the knock on the door, they were essentially saying, open the door, we are here to do illegal business, right? That was the signal. The signal was, we knock this way, three knocks and then two knocks or something, is a signal that we're here to do some illegal business. And that was a misstatement, right? That was a misstatement. Assuming that he was entitled to the truth, which of course he was not, once he opens the door, it's perfectly clear that these are not, that these are police. Right? That's correct. Once he opens the door, whatever deception was involved in coming to the back door or knocking in a particular way is dissipated. And at that point, he can say, no, thank you, I'm not buying today, I gave it the office, and close the door again, right? Well, first of all, as the agents testified, he was surprised and caught off guard to the point that, again, I go back to the Johnson case in which the initial exposure So there's a constitutional right not to be surprised? No, Your Honor. I just want to show that that's not what he was expecting. And I think But he didn't testify at the trial, and I thought the testimony of the agents was that he was calm and respectful after the trial. That was part of it, yes. That was part of it. After they opened the door and after they testified that he looked surprised. But I want to point again to Johnson. Johnson talks about the fact that the police misrepresented, that's why it made Johnson's initial exposure involuntary. It was not consensual. And that's what happened in this case, Your Honor. I'd like to reserve the last two minutes for rebuttal. Could I just stick in one quick question, because there's an entirely different point. Can you win on Miranda and lose on the entry? In other words, they took your gentleman off to the side in a separate room, they kept him there for half an hour, they didn't give him his Miranda warnings, and he made incriminatory statements. Do you have an independent Miranda argument here separate from the board? Yes. All right. I might want to hear more about that on rebuttal. Good morning. May it please this Court. My name is Wallace Kleindienst. I represent the United States of America. We asked the Court to affirm the district court judge's findings of fact, which were not clearly erroneous, that there was a valid consent given by the defendant for the Border Patrol agents to enter the house in search for illegal aliens. We also asked this Court to affirm the district court's findings of fact is not clearly erroneous, that after the shotgun was found in the house, the agent asked the defendant, who was not in custody for Miranda purposes, whose gun that belonged to. We believe that the facts in this case are clear. The Johnson case is not this case. It's not a knock-and-talk case. The Johnson case, the officers went there to make an arrest. They knocked on the door of the residence in the daytime, and the defendant opened the door. They had the guns drawn. The defendant was inside his house. It was not a knock-and-talk, and the Court held in Johnson that that was an illegal arrest because the defendant had not given an implicit license for police officers to come to the house, to get him to open the door, and to arrest him while he's inside his house. That's not a knock-and-talk case as this case is. So Johnson is not really controlling at all. Can I nudge you just under the Miranda issue? Sure. Because it would probably only take a minute. But here's Mr. Poum. He's in the house. He's been segregated from off to one side. I know that's for security purposes. He's with Agent Haradiya, I believe, and Agent Haradiya starts asking him questions about this rifle without giving him Miranda warnings or a shotgun without giving him Miranda warnings. Are you arguing really that Mr. Poum knew at that time that he could leave and that if he was not in custody he could just say, well, good night, I'm going to go visit my auntie a half a mile from here, see you later? Wouldn't a normal person under those circumstances deem himself being in custody? With all due respect to the Court, Your Honor, those are not the facts in this case. All right. Agent Haradiya, I may have pronounced his name wrong, he was the first agent at the door. Right. When Mr. Poum Medina opened the door, his testimony was he pulled Mr. Poum aside so the other agents could go inside the house and search for illegal aliens, which he had given consent for. He was detained right at the door, right outside the house, number one. Number two, Agent Diaz, who was the second officer to go into the house, immediately found a closet. It's a small house. And in the closet he found a shotgun. And the sequence is very quick because the closet isn't that far from the door. When he found the shotgun, he announced to everybody, for officer safety, I found a gun. At that point in time, Diaz comes back to where Haradiya has Mr. Poum detained outside the house by the back door because Mr. Poum had said that he was an American citizen. When the shotgun was found, Mr. Haradiya asked him who did the gun belong to. And right away he said, well, my friend Warrell bought it for me because I'm not a U.S. citizen. And then he asked him to explain what did you mean. He goes, well, I was trying to become a U.S. citizen and I'm still trying to become one under marriage. So the sequence of events were very quick. He was not held for a long period of time before those questions. Just read the record. For some reason I thought the record said he was held for half an hour before the questioning occurred. With all deference to court, you did, Your Honor. All right. Okay. What I think the Court may have been confused about is that after Mr. Medina admitted to possession of the gun, when he was not in custody for Miranda purposes, he was being detained for officer safety. The courts say you can do that when you enter a house to conduct a search. You can detain somebody for officer safety and not be custodial. What happened was after Mr. Medina admitted to the ownership of the gun, they actually allowed him to go into the house to find papers that would show that he was a U.S. citizen. And after he made an attempt to find those papers and could not find them, and that's where the time expansion existed, he was then placed under arrest. He was Mirandized and he declined to make any statements. So the statements were made right at the very beginning of the knock and talk after the agents had entered the house. Because he was only being detained for officer safety, there's no threats made to him. He was not placed under arrest. No guns were pointed at him. The district court did not clearly make factual findings clearly erroneous that he was not in custody for Miranda purposes. The Court, I know, issued an order wanting to discuss the impact of Florida v. Jardines in this case. I know the Court did not ask Petitioner about that issue. If the Court is interested, I can address that. Simply stating that case is not appropriate and not applicable to this case. And the difference is that in Jardines, the police went there not to do a knock and talk. That was not their intent at all. The police went to the house to see if they could develop evidence that the defendant was involved in drug distribution or drug dealing. They brought along a drug canine dog. They went to the front door, and it was daytime. They did not knock on the door. They had the dog sniff around the front door, and the dog, after a period of time, actually sat down, which they're trying to do because he smelled the odor of drugs coming through the front door. Never knocked on the door. They went and got a search warrant, came back, searched the house, found the drugs. The whole thing in Jardines is, is that a homeowner does not give an implied license for the police to come through the curtilage, to the front door, conduct an investigation. That that's not part of what the license is for, for visitors to visit somebody at their home. This is not Jardines. This is, it wasn't there to develop evidence outside the house to incriminate him. It was going to the house, although at night, but it's clear from the informant that the defendant expected visitors, whether it be alien smugglers or whether it be border patrol agents who actually talked to a smuggler, that at that time of night, he expected and had an implied license for people to approach the back of his house to knock on the door. In this case, although it was around midnight, the evidence was that there was a suburban parked behind the back of the house next to the back door. The light in the back door was on. The lights in the house were on. And the light on the front porch was also on as well. But because the defendant had, in fact, the smuggler who they had apprehended the border had said he had done this many times, the defendant gave an implied license for people to approach the back door of the house to knock on the door to gain entry. Sotomayor, I don't think that's deception, Your Honor. I think that maybe deception. No, no, I wasn't suggesting deception because, as Judge Graber points out, they can deceive, you know. But isn't there sort of a privacy issue there, sort of like using somebody's password? No, Your Honor, not in this case. Privacy interest is not implicated by this case. It wasn't argued by the privacy. Let's say that the informant had given the police and said, look, there's a backyard and there is a lock there, a combination lock. And everybody that engages in this illegal business is given the combination lock so they can walk into the back door and, you know, let me just embellish a little bit. You know, if they've got aliens with them, they can park them in the backyard and then knock on the back door and transact business with the owner. And the informant had given this secret combination to the agents to allow them into the curtilage, into the backyard. And would that have raised the Jardines issue? The Jardines issue, Your Honor. The very ability to enter the curtilage that is not otherwise open to the world. Within the context of Jardines, Your Honor? Yes. No. No, it's a different issue altogether. If they had gone there to find evidence in the curtilage and not with the intent to do a come to their house. Because, you know, the knock is sort of like a combination. Not really. Well, it sort of is. If we say, look, the deal is that he opens the back door when he gets the secret knock. If he doesn't get the secret knock, he doesn't open the back door at all. He doesn't talk. He doesn't open the door. Because he knows it's not somebody there for the right kind of purposes. I don't think that's the same as this case, Your Honor. I think, well, being given the combination to the lock on the back door would imply, then, that once you use the combination, open the lock, then you open the door and went in. That's not what happened here. Here is the fact that the defendant, and it was probably foreseeable to him that an alien smuggler might turn on him and provide the police with the knock on the door to have him open the door. Let me give you a sort of more relevant example, or more relevant to us, you know, to those of us who live in an urban environment. Once in a while you go visit friends that have a locked garage, and they say, well, you know, you can park your car in the garage, and here's the combination to the gate, because, you know, you can get off-street parking. And that's only given to certain people, right? If the police get that kind of combination, is that implicated in Jardine's kind of, you know, it's an open area. It's not an area that's then, you know, the garage isn't a house. It's a place of curtilage. And they get the secret information that gives them access to an area that otherwise is not open to the general public, but it's still not a house. Right. I don't think Jardine's is implicated because that's a search-and-seizure issue that doesn't deal with a knock-and-talk, as this case does. I think that in your example, Your Honor, if I understand you correctly, you may have a combination to perhaps un-open the garage door, but if the defendant is there and they open the garage door, that's an affirmative act by the police that's not in this case, by opening the garage door, by having a combination to the lock. All the police did in this case was just knock on the door in a certain way that the defendant may have known that's the way that he could expect visitors to his back door. In your hypothetical, Your Honor, assuming that they did open the lock and had opened the garage door, I guess conceivably the defendant could be standing on the other side of the garage door, and when they opened the door, which they didn't in this case, but in your example, if the police opened the door, I think that's an intrusion that might be unconstitutional. If the defendant was on the inside of the garage door and it opened up, and you saw it was the Border Patrol agents, he could say, I'm sorry, I don't give you permission to be here, and close the garage door. I don't think that's... Maybe that's definitely not the case. We'll just wait for that to happen. I'm sure it will eventually. Anything's possible, Your Honor. Very good. Okay, thank you. Thank you, Your Honor. I would then ask the Court to affirm the findings by the district court and uphold the guilty verdict in this case. Thank you. Thank you. Your Honors, with respect to the Jardines case, clearly they were in the curtilage. It was the back door, once again. As the pictures note, it wasn't accessible to the public. And despite what government counsel noted, this isn't just a knock and talk. The agents talked about how they came, parked their cars in the alley. They even testified that they jumped the fence. I mean, that's not an implicit license. I'm sorry. You say what isn't accessible to the public? The back door was not accessible to the public. It was clearly to – he took steps to clearly conceal the back door. As the exhibits noted in the supplement, there's a trellis there that conceals the back door. The back door is facing a wall. So it's not accessible to the public. So the idea that they went there with the honest intention of asking questions, I think all the circumstances show that it was just the opposite. Can you say all the circumstances? You're asking us to draw a lot of inferences from the location of a trellis and photographs. The defendant didn't testify. Nobody else who lived at the house testified. The only testimony we had was the testimony from the agents. Is that right? Other than the trellis and the physical things which you say we could draw inferences from. There aren't any inferences. The agents testified that they approached the house, the back door at midnight to use the password to gain entry into the house. Right. That's not a permissible knock and talk. So they testified to that. That's in the testimony. All the agents said that that's what happened in this case, Your Honor. And that's why we don't – there's no implicit license to do that, and that's why this case is just like Jardine's. Uh-huh. Well, the difference with Jardine's is that, I think Justice Kagan's separate concurrence said that the difference with Jardine's is that they intruded into the house. They actually went into the house. He talks about how you couldn't come on the porch with a pair of high-powered binoculars and look through the windows into the house. That would be an intrusion into the house. This was an olfactory intrusion into the house. They actually came into the house through the nose of the dog, so to speak. These agents never went into the house. Jardine's doesn't really apply here. They never went into the house until your client said they could come in. They trespassed. They went into the curtilage. They went to the back door. The informant told them, knock on the door this way to see if the aliens are still there. That's why they went there. They went there to knock on the door to get to see if the aliens were there. And the only way he was going to open the door, you know, our position was that by deceiving him into believing there was someone else. And they were not invited visitors. Okay. Thank you. Okay. Thank you.
judges: Ponsor, Kozinski, Graber